Herbert SPRINGER, Appellant,

v.

UNITED STATES, Appellee.

Reginald TURNER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 11958, 12240.

District of Columbia Court of Appeals.

Argued Jan. 24, 1978.

Decided June 6, 1978.

Howard J. Schulman, Baltimore, Md., of the bar of the State of Maryland, pro hac vice, by special leave of court, with whom James E. Crawford and Nelson Deckelbaum, Washington, D. C., were on the brief, for appellant Springer.

Patrick J. Christmas, Washington, D. C., for appellant Turner.

James F. Hibey, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, and Eugene M. Propper, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and YEAGLEY, Associate Judges.

NEWMAN, Chief Judge:

■ Appellants were convicted by a jury of conspiracy to commit first-degree murder and of solicitation to commit a felony, to wit: first-degree murder. On appeal they each claim: (1) that prejudicial error resulted from the procedures utilized by the trial court in admitting into evidence and (placing before the jury) tape recordings— and transcripts thereof—of conversations

between Springer and Detective Bagley, an undercover Metropolitan Police Department (MPD) detective; and (2) that the trial court deprived them of their Sixth Amendment right to confrontation by unduly limiting the cross-examination of a key government witness on the issue of bias.[1] After setting forth the facts in Part I, we discuss the issue of admission of the tapes and transcripts in Part II. While concluding that no reversible error was committed in this case by the procedures used to admit them into evidence, we lay down guidelines for use by the trial court in the future in this area. In Part III, we discuss the cross-examination issue, find substantial prejudice to both appellants from the trial court's erroneous curtailment of cross-examination, and reverse the conspiracy count of Springer's conviction and both counts on which Turner stands convicted.[2]

## I

In January 1976, appellant Reginald Turner met with Clarence W. McFarland, whom he had known for approximately eight years, and offered him a "proposition." Turner told McFarland that his friend, appellant Herbert Springer, was willing to pay $10,000 for the murder of his wife. To corroborate his story, Turner called a store on Eighth Street, N.W., and while McFarland listened in on the conversation, received confirmation from someone who was identified as "Herbie," that he still wanted his wife killed. "Herbie" declared that he didn't care how it was done, and

that he was willing to pay $10,000. McFarland told Turner he was interested in the "proposition."

At some point during the next month, Turner and McFarland decided to ask Springer for part of the money in advance. When Turner failed to procure an agreement from Springer for advance payment, McFarland broke off all discussions about the killing. In May 1976, McFarland was again approached by Turner, who indicated that Springer still wanted to have his wife killed. Several days thereafter, Turner showed McFarland a piece of paper on which Springer had written his wife's route to work, the make of her car, and its license plate numbers. Later in May, McFarland and Turner met Springer in a nightclub. When Turner asked Springer if he still wanted the job done, Springer answered yes, stating that he didn't care what method was selected.

Thereafter, becoming concerned that he was being double-crossed by both Turner and Springer, McFarland recounted the murder proposition to an FBI agent with whom he was then working as an informant on an unrelated case. That agent alerted MPD Homicide Squad Commander Joseph O'Brien to the plan. Captain O'Brien assigned Detective Clayton T. Bagley to pose as a killer-for-hire.

Bagley contacted Springer by phone on July 27, 1976, identifying himself as "Lank," a hit man, and confirmed that Springer still wanted the murder commit-

1. We find no merit in appellants' other claims of error. Specifically, we hold: (1) that there was sufficient independent evidence of a conspiracy to validate the admission of hearsay testimony from a key government witness, see United States v. Nixon, 418 U.S. 683, 701 & n. 14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); (2) that the trial court did not err in refusing to submit the issue of entrapment to the jury since there was no evidence that the government "'actually implant[ed] the criminal design in the mind of the defendant'" Springer, Hampton v. United States, 425 U.S. 484, 489, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976), quoting United States v. Russell 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); (3) that no substantial prejudice resulted from the prosecutor's opening statement, closing argu-

ment, or rebuttal argument, see Bennett v. United States, D.C.App., 375 A.2d 499, 504 (1977); (4) that there was no plain error in the trial court's failure to strike, sua sponte, the testimony of a MPD captain concerning the initiation of the MPD investigation into this case, see Watts v. United States, D.C.App., 362 A.2d 706 (1976) (en banc); and (5) that appellant Springer was not denied the effective assistance of counsel, as measured by the standards set forth in Angarano v. United States, D.C.App., 312 A.2d 295 (1973), rehearing en banc denied, 329 A.2d 453 (1974).

2. The curtailed cross-examination was not relevant to appellant Springer's conviction of solicitation to commit a felony, which we affirm.

ted and was willing to pay $10,000 for that purpose, but with no "front money." At the end of the conversation, which was taped, the two agreed to meet the next day at Ninth Street and Constitution Avenue, N.W. During the course of the conversation the following day, which was also taped, Springer stated that he wanted the murder to look like an accident. He gave Bagley his wife's name, description, address, place of employment, make of car, and license plate number.

On July 29, 1976, the police contacted Mrs. Springer and informed her of the murder scheme. After identifying her husband's voice on the tapes, she agreed to cooperate with the police's feigned execution of the murder scheme. She provided the police with rings that she always wore, which they planned to show to Springer as proof of Mrs. Springer's death.

Bagley phoned Springer to announce his wife's death and, in a third taped conversation, insisted on payment.[3] Springer, after expressing reluctance to make payment without positive proof of his wife's death, finally agreed to pay $100—contingent on viewing his wife's rings. A short time later when Bagley showed Springer the rings and received the $100 from him, Springer was placed under arrest.

Clarence McFarland was a key government witness at trial. McFarland's testimony traced his involvement in the murder scheme from his initial contact with Turner; through the various intervening acts; culminating with his eventual withdrawal from the plan and disclosure of the scheme to an FBI agent. On direct examination, McFarland stated that he had never intended to go through with the murder, but merely had wanted to make some money by "conning" Springer.

During cross-examination, appellant Springer's counsel attempted to elicit whether McFarland was paid for the information he had disclosed to the FBI in this case. McFarland stated that he had received neither payment, nor promise of payment, for any information he had provided in this case. The trial court cut off all inquiry into McFarland's expectation of or actual receipt of payments for serving as an informant for law enforcement agencies in other cases.

The day following McFarland's testimony, Springer's counsel proffered the testimony of an FBI agent who was prepared to testify that in August 1976, after Springer and Turner were arrested, McFarland did receive payment from the FBI for his disclosures in this case. He would have further testified that because the payment was included in a sum paid for work on an unrelated case, McFarland was unaware that he had received any money for information in this case. Following the proffer, the trial court refused to reconsider its prior ruling and to permit inquiry into McFarland's status as a paid informant for the FBI, or into any matter directly related thereto.

During the testimony of Detective Bagley, tape recordings (and transcripts thereof) of the three conversations between Springer and Detective Bagley wherein Bagley posed as a "hit man" were admitted into evidence over objection by both appellants.[4]

Bagley testified to recording the conversations in question and to labeling the original tapes of the conversations with his initials and the date of each conversation. In addition, Bagley stated that he had made a

3. During the testimony of Detective Bagley, the tapes of the three conversations between Bagley and Springer were introduced into evidence, along with transcripts of each tape. *See* Part II, *infra*, for a discussion of the procedures utilized in authenticating and admitting these tapes and transcripts.

4. Before trial, counsel received a preliminary draft of the transcripts and had the opportunity to listen to and examine the tapes. The tran-

script admitted at trial differed slightly from that provided pretrial. The original version of the transcript indicated that a passage was "unintelligible," but that passage in the transcript used at trial included a statement by Springer, "It's going to be done like an accident." It is undisputed, in this court, however, that the tapes contained no deletions, additions, or splices.

duplicate of the tape in order to have all three conversations on one tape and in an attempt to amplify the original tapes. Bagley testified to his preparation of a transcript of the taped conversations, made by listening to the tapes, and also to his positive comparison of both the original and the duplicate tapes with that transcript.

The original tape of the July 27 phone call, without accompanying transcripts, was then played for the jury. The trial court (not having listened previously to the tape outside the jury's presence) compared the transcript prepared by Bagley with the tape during the playing of them before the jury. Because of problems with the audibility of the original tape, the court excused the jurors, and made audibility comparisons between the original and duplicate tapes. The court then ruled that the original tapes, played without amplification, and the transcripts, which he found "follow[ed the tape] word for word," would be admitted.

When the jurors returned, they received copies of the transcript which they were permitted to use while the tapes were being played. Following the playing of the tapes, the transcripts were collected from each juror. The court gave no instruction (and none was requested) cautioning the jurors that the tapes were primary evidence and that the transcripts were to be used merely as an aid in listening to them.

During a recess which followed the playing of the tapes for the jurors, Springer's counsel compared the tapes with the version of the transcript which had been supplied to the jury. As a result of this comparison, counsel pointed out what he believed was a major discrepancy between a line in the transcript which had Springer saying, "It's going to be done like an accident," and the tape portion which counsel believed was unintelligible. In response, the trial court suggested that counsel, during closing argument, urge the jury to listen again to the tapes while deliberating and that counsel argue to the jury the question of whether that tape portion was in fact unintelligible.

In instructing the jury, the court made it clear that both the tapes and transcripts were in evidence. Although the transcripts were sent into the jury room with the other exhibits, the tape recordings were not. The court instructed the jury that they could use the transcripts during deliberations, and that if the jury wanted to hear the tapes again, the foreman should deliver a written request to the Marshal.

## II

■ The admission of tape recordings at trial is a matter committed to the sound discretion of the trial court. *Monroe v. United States,* 98 U.S.App.D.C. 228, 234, 234 F.2d 49, 55, *cert. denied,* 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956); *United States v. Weiser,* 428 F.2d 932, 937 (2d Cir. 1969), *cert. denied,* 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971). In exercising this discretion, the trial judge must determine whether the government has met its burden of showing by clear and convincing evidence—which may be direct or circumstantial—that the tapes are authentic, accurate, and trustworthy. *United States v. Haldeman,* 181 U.S.App.D.C. 254, 330, 559 F.2d 31, 107 (1976), *cert. denied sub nom., Mitchell v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Knohl,* 379 F.2d 427, 440 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). The governing standard concerning admissibility of tapes is, of necessity, a general one. " '[T]he possibilities of misidentification and adulteration [must] be eliminated, not absolutely, but as a matter of reasonable probability.' " *United States v. Haldeman, supra,* 181 U.S.App. D.C. at 330, 559 F.2d at 107, *quoting Gass v. United States,* 135 U.S.App.D.C. 11, 14, 416 F.2d 767, 770 (1969).

■ Even if the trial court is satisfied that the recording is accurate, the court must also determine whether the tape is sufficiently audible for the jury to properly evaluate its contents. The mere fact of some inaudibility does not require exclusion: "Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to

the sound discretion of the trial judge." *Monroe v. United States, supra,* 98 U.S.App. D.C. at 234, 234 F.2d at 55. *United States v. Bryant,* 480 F.2d 785, 790 (2d Cir. 1973). *See also, United States v. Hall,* 342 F.2d 849, 852–53 (4th Cir.), *cert. denied,* 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965).

Because "[a] transcript ha[s] a corroborative effect similar to that which any photograph, drawing, or mechanical model has when used by a witness to amplify testimony," *United States v. Hall, supra* at 853, transcripts introduced contemporaneously with recordings may be utilized to assist the jury in following taped conversations. *United States v. Turner,* 528 F.2d 143 (9th Cir.), *cert. denied sub nom., Grimes v. United States,* 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975). The admission of *accurate* transcripts as an aid in listening to tape recordings is similarly committed to the trial judge's discretion. *United States v. Turner, supra; United States v. Koska,* 443 F.2d 1167, 1169 (2d Cir.), *cert. denied,* 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971). Where both parties stipulate to the accuracy of the transcript or accuracy is judicially determined, and cautionary instructions against undue reliance on the transcript are given the jury, an exercise of discretion will rarely be disturbed on appeal. *See, e. g., United States v. Bryant, supra.*

In the instant case, Detective Bagley's testimony undoubtedly laid a sufficient foundation to satisfy the government's burden of demonstrating the authenticity and accuracy of the tapes prior to their admission.

However, the correctness of the admission of the transcripts is less clear. Here, there was no stipulation as to accuracy of the transcript; no preliminary authentication of the tapes by the court outside the presence of the jury; and no cautionary instruction given by the court to the jury. Nonetheless, during the initial playing of the tapes, the court personally verified the accuracy of the transcripts and made a finding that the transcripts compared with the tapes "word for word." Even if Springer's counsel was correct in his contention that an inaccuracy existed in one sentence of the transcript, the addition of that one sentence in an otherwise accurate transcript would not render the transcript per se inadmissible.[5]

We conclude that the trial court here used less than ideal procedures to verify the audibility of the tapes and the accuracy of the transcript and committed error in permitting the transcripts to be taken by the jurors into the jury room during their deliberation. However, we are satisfied that such error was harmless. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Although we find no prejudicial error in this case, in the exercise of our supervisory powers, *Oliver v. United States,* D.C.App., 384 A.2d 642 (1978); *Jackson v. United States,* D.C.App., 262 A.2d 106 (1970), we take this opportunity to set forth guidelines to assist the trial court in the future when confronted with questions of admissibility of tapes and transcripts.

Where feasible, the parties should verify the accuracy of any transcript and the audibility of the tapes pretrial, and an appropriate stipulation on these points then should be entered in the record.[6] Where the parties are unable to enter such a stipulation, the determination of audibility and accuracy rests with the trial court, and the court must make appropriate findings of fact. The court, preferably pre-

---

5. The question of audibility was adjudicated by the trial court and is not challenged on this appeal save for the one sentence. The challenged sentence hardly, if at all, heightened the extremely incriminatory character of the tapes as to Springer.

6. The "omnibus hearing" of the type used by a number of the judges of the trial court sitting in felony trials provides an excellent opportunity for the trial court to explore the prospect of such stipulation and to provide appropriate direction and guidance to assist counsel in this effort.

trial,[7] and always out of the presence of the jury, should listen to the tapes for audibility and verify that the transcript is an accurate transcription of the tape. Only after the court has made such factual findings should it permit the jury to utilize the transcripts as an aid in listening to the tapes. The transcripts themselves are not the evidence—the tapes remain the evidence. To prevent undue reliance on the transcripts, the jurors should only be permitted to have possession of or to refer to the transcripts when the tapes are being played. Further, whenever the transcripts are utilized, the jury should be informed, by a cautionary instruction, that the transcripts are provided merely to facilitate their comprehension of the tapes and that if they perceive any differences between the tapes and the transcripts, it is the content of the tapes on which they are to rely. This cautionary instruction should be repeated when the case is submitted to the jury. The transcripts should not be permitted in the jury deliberation room without the express consent of all parties concerned. However, if during jury deliberation the court permits the jury to rehear tapes in open court, it may permit re-use of the appropriate transcript, with cautionary instruction. *See United States v. Turner, supra* at 167–68; *United States v. McMillan,* 508 F.2d 101 (8th Cir. 1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975); *United States v. Lemonakis,* 158 U.S.App.D.C. 162, 485 F.2d 941 (1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974).

### III

Each appellant argues that the trial court's restriction of the cross-examination of McFarland, a key prosecution witness, resulted in a denial of his Sixth Amendment right to confrontation. Appellants claim that the trial court erred in preventing exploration into McFarland's status as a paid government informant and his resulting financial motive in providing informa-

tion to the FBI, as well as into his general motive to curry favor with the government. The government contends that the trial judge's restriction of cross-examination was an appropriate exercise of discretion to limit the scope of cross-examination.

It is axiomatic that the Sixth Amendment guarantees to a defendant in a criminal prosecution the right " 'to be confronted with the witnesses against him.' " *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). Central to the fundamental right of confrontation and to the conduct of an effective defense is the opportunity to cross-examine government witnesses against the defendant. *Id.* at 315–16, 94 S.Ct. 1105. Although the right to cross-examine is thus inherent in the Sixth Amendment right to confrontation, "[the] extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). Some meaningful degree of cross-examination must be allowed in the first instance in order to comply with the Sixth Amendment's command in this regard. The question of the degree to which the powerful tool of cross-examination must be permitted beyond that point cannot be reduced to a definitive abstract formula, but rather must be evaluated in light of the specific circumstances presented by each case. *United States v. Houghton,* 554 F.2d 1219 (1st Cir. 1977). Of course, the trial judge may always limit cross-examination "to preclude repetitive and unduly harassing interrogation," *Davis v. Alaska, supra,* 415 U.S. at 316, 94 S.Ct. at 1110; to prevent danger to witnesses, *United States v. Marti,* 421 F.2d 1263, 1265–66 (2d Cir. 1970), *cert. denied,* 404 U.S. 947, 92 S.Ct. 287, 30 L.Ed.2d 264 (1971); to prevent unnecessary degradation or humiliation of witnesses, *see Tinker v. United States,* 135 U.S.App.D.C. 125, 417 F.2d 542, *cert. denied,* 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118

7. *See, e. g.,* D.C.Code 1973, § 23–104(a)(1) (pretrial appeals by United States from order denying the prosecutor the use of evidence at trial).

(1969); or to prevent inquiry into matters having little relevance or probative value to the issues raised at trial, *Miles v. United States,* D.C.App., 374 A.2d 278 (1977).

■■■ However, the permissible scope of cross-examination "must be limited with the utmost caution and solicitude for the defendant's Sixth Amendment rights," *United States v. Houghton, supra* at 1225, and "this discretionary authority to limit cross-examination comes into play after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." *United States v. Bass,* 490 F.2d 846, 857–58 n. 12 (5th Cir. 1974). The trial court's "wide latitude in the control of cross-examination . . . 'cannot . . . justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.'" *United States v. Harris,* 501 F.2d 1, 8 (9th Cir. 1974), *quoting Gordon v. United States,* 344 U.S. 414, 423, 73 S.Ct. 369, 97 L.Ed. 447 (1953).

The Supreme Court in *Davis v. Alaska, supra,* stated in this regard:

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i. e.,* discredit, the witness. . . . [By generally discrediting the witness] the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. . . . A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to

exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." . . . We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. [415 U.S. at 316–17, 94 S.Ct. at 1110 (citations and footnote omitted).]

■■■ The exposure of bias or partiality as a motivational factor may be even more damaging to the value of a witness' testimony than a more generalized credibility attack and may be a crucial determinant in the jury's assessment of the trustworthiness of a witness. Thus, "bias is always a proper subject of cross-examination." *Hyman v. United States,* D.C.App., 342 A.2d 43, 44 (1975). Although inquiry designed to elicit possible bias is a major purpose of cross-examination of any witness, the importance of such examination assumes greater significance in certain circumstances. For example, bias cross-examination directed to a key witness may be extremely important to the jury's determination of guilt or innocence, *see Moss v. United States,* D.C.App., 368 A.2d 1131, 1134–35 (1977); *Rhodes v. United States,* D.C.App., 354 A.2d 863, 864–66 (1976); *White v. United States,* D.C.App., 297 A.2d 766 (1972), especially where one who is a key government witness is also a professional informant, *United States v. Alvarez-Lopez,* 559 F.2d 1155 (9th Cir. 1977); or an accomplice or participant in the crime for which the defendant is being prosecuted, *United States v. Rice,* 550 F.2d 1364, 1371 (5th Cir. 1977), *cert. denied,* 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1978). Such cross-examination is also of significant import where a witness' testimony establishes "a required element of the charged offense" or goes to "the heart of the defense at trial," *United States v. Callahan,* 551 F.2d 733, 737 (6th Cir. 1977), or has little independent corroboration, *United States v. Rodriquez,* 439 F.2d 782 (9th Cir. 1971).

■■■ Thus, in reviewing claims of error based upon the trial court's excessive

restriction of cross-examination, the standard of review employed by this court will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial. We will first examine the record to determine whether any such error committed is of constitutional dimension—*i. e.,* whether the trial court has permitted sufficient cross-examination to comport with the requirements of the Sixth Amendment right to confrontation. Where examination of the record shows that the trial court's curtailment of cross-examination rises to the level of abridgment of the defendant's constitutional right to effective cross-examination, we must then decide whether such constitutional error by the trial court is of such magnitude as to require reversal per se, *see, e. g., Davis v. Alaska, supra; Gillespie v. United States,* D.C.App., 368 A.2d 1136 (1977); or whether such error may be considered harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *see, e. g., United States v. Pugh,* 141 U.S.App.D.C. 68, 71–72, 436 F.2d 222, 225–26 (1970); *Rhodes v. United States, supra* at 865–67.

We have already commented upon the central role which exploration of potential bias during cross-examination plays. Thus, such inquiry must of necessity be accorded wide latitude and must not be unduly restricted. Where the record reflects a curtailment of a requested line of bias cross-examination *in limine,* so that the jury is unable properly to perform its fact-finding function in inferring bias from the testimony as a whole, we will assess cross-examination errors by a per se error standard. *Alford v. United States, supra; United States v. Mayer,* 556 F.2d 245, 252 n. 10 (5th Cir. 1977). *See also Hyman v. United States, supra* at 44.[8] If, however, the trial court has permitted *some* cross-examination so that the jury has sufficient information from which to infer bias (should it so choose), this court will evaluate error by application of the harmless constitutional error test of *Chapman v. California, supra.* To hold harmless such error in curtailing constitutionally-protected cross-examination, it must be clear beyond a reasonable doubt "(1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony." Note, *Constitutional Restraints on the Exclusion of Evidence in the Defendant's Favor: The Implications of Davis v. Alaska,* 73 Mich.L.Rev. 1465, 1473 (1975) (footnote omitted).

Where we determine that a degree of cross-examination consistent with the Sixth Amendment has been allowed, our appellate review will focus on the scope of the cross-examination allowed, and the trial court's determination will stand unless an abuse of discretion mandating reversal is shown. *See, e. g., Flecher v. United States,* D.C.App., 358 A.2d 322, 323–24, *cert. denied,* 429 U.S. 977, 97 S.Ct. 486, 50 L.Ed.2d 585 (1976); *United States v. Houghton, supra.*

Pursuant to the above-enumerated principles, examination of the record in this

---

**8.** The Supreme Court utilized the per se error standard in *Davis v. Alaska.* In rejecting the state's argument that the record included sufficient facts for the jury to infer bias of the key witness, without the restricted cross-examination, the Court stated:

> On these facts it seems clear to us that to make any such inquiry [into bias] effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right to effective

cross-examination which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314." *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). [415 U.S. at 318, 94 S.Ct. at 1111.]

This court employed the per se error standard in *Gillespie v. United States, supra,* where the trial court had prevented *any* inquiry into the juvenile record of a key prosecution witness with the result that evidence of the witness' potential bias never was presented to the jury.

case reflects curtailment of an appropriate line of bias cross-examination *in limine* which prevented the jury from receiving information as to McFarland's status as a government informant essential to an assessment of his credibility as a government witness and a concomitant assessment of the *guilt or innocence* of both defendants. The requested line of cross-examination was an attempt to explore McFarland's possible bias and motive to curry favor with the government. The fact that McFarland believed he was not paid for the information he gave to the FBI, on which the government places great reliance, was inconclusive on the issue of any bias he may have harbored.[9] Had he been given the opportunity, trial counsel could have explored whether McFarland had any expectation of payment or of other nonfinancial reward as a result of his prior dealings with the FBI, as well as whether McFarland actually did not know that, in fact, he was paid. The jury then could have inferred any potential bias from McFarland's testimony which it deemed warranted by these facts.

The trial court's error in curtailing the cross-examination of McFarland is rendered more egregious by the fact that McFarland was a key government witness. *See Moss v. United States, supra.* His testimony provided essential evidence of both the conspiracy between Turner and Springer and Turner's solicitation of him (McFarland) for participation in the murder scheme. *See United States v. Callahan, supra.* Furthermore, it is clear that without McFarland's testimony, which had little corroboration, the government's evidence was insufficient to convict on either of the conspiracy charges or on Turner's solicitation charge. *See United States v. Rodriquez, supra.* Thus, extensive cross-examination as to any

potential bias of McFarland was required to satisfy the Sixth Amendment confrontation guarantee.

Therefore, we hold that by curtailing a line of bias cross-examination of McFarland *in limine,* the trial court abrogated the fact-finding function of the jury to determine credibility and thereby committed per se reversible error. *See Davis v. Alaska, supra,* 415 U.S. at 318, 94 S.Ct. 1105; *Gillespie v. United States, supra.* Thus, we reverse the conspiracy count of Springer's conviction and both counts of Turner's convictions.[10]

*So ordered.*

---

9. Further, even if it were established that an informant had not in fact received payment for information in a particular case, the nature, character, duration, and extent of his relation with government authorities in prior cases may be illuminative on the issue of his motive to curry favor, *i. e.,* bias.

10. Even were we to utilize the harmless error standard of review, the facts of this case would mandate reversal since the government has failed to show beyond a reasonable doubt (a) that the appellants *would have been convicted* without McFarland's testimony, or (b) that the restricted inquiry into bias would not have weakened the impact of McFarland's testimony. *See* p. 856 *supra.*