Deronte M. TUCKER, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–1381.

District of Columbia Court of Appeals.

Argued Jan. 16, 2003.
Decided March 31, 2005.

Mary Manning Petras, Washington, DC, for appellant.

Suzanne G. Curt, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, Douglas K. Klein, and Melanie I. Sloan, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, REID and GLICKMAN, Associate Judges.

REID, Associate Judge.

Appellant Deronte M. Tucker was charged with first-degree murder while armed (premeditated), in violation of D.C.Code §§ 22–2401, –3202 (1996),[1] and convicted of the lesser included charge of second-degree murder. He also was con-

---

[1] Recodified at D.C.Code §§ 22–2101, –4502 (2001).

victed of possession of a firearm during a crime of violence, in violation of § 22–3204(b),[2] carrying a pistol without a license, in violation of § 22–3204(a),[3] unlawful possession of an unregistered firearm, in violation of D.C.Code § 6–2311(a) (1995),[4] and unlawful possession of ammunition, in violation of § 6–2361(3).[5] He filed a timely appeal and primarily contends that the trial court erred by (1) refusing to compel the government to produce a government witness' grand jury testimony from another murder case in which the witness misidentified the perpetrator, and prohibiting cross-examination of the witness' alleged prior "false testimony"; (2) improperly curtailing the cross-examination of another witness; and (3) giving a second-degree murder instruction. We affirm the judgment of conviction.

## FACTUAL SUMMARY

The government presented evidence showing that around 10:30 p.m. on the night of October 8, 1999, Mr. Tucker shot and killed Eugene Adams, Jr. on Second Street in the Southwest quadrant of the District, at the Syphax Apartment complex. Just prior to the shooting, Mr. Adams had been playing craps or shooting dice outside the complex with other men, including Mr. Tucker and Troy Carter. Mr. Carter saw Mr. Adams leave the game after losing and lean on a nearby gate. Mr. Tucker took his turn at the game, won, but did not pick up his money. Instead, he left the game. Mr. Carter heard a gunshot and started running. As he was running, he "looked back" and saw Mr. Tucker standing ... over top of [Mr. Adams while he] kept shooting." He heard "around eight or nine [more] shots."

Another eyewitness, Natasha Sanders, who lived in the Syphax Apartment complex and was visiting a friend in the same complex at the time of Mr. Adams' murder, was at a window eating pizza. When she had gone to the street to pick up her pizza from the delivery person, she spoke with Mr. Tucker, whom she described as a friend she has known for ten years. While sitting at the window, she saw the crap game in progress and observed Mr. Adams at the fence. She watched as Mr. Tucker "left the crap game" and proceeded to the place where Mr. Adams stood. She heard shots and saw Mr. Tucker shoot Mr. Adams in the back. Mr. Adams ran and fell face down. Mr. Tucker walked away but returned and shot Mr. Adams "about 10 or 11" more times while standing "over top of him." Two days prior to the murder, Mr. Tucker visited Ms. Sanders and her five-year-old son in her apartment. She was in the kitchen after preparing her son for bed. Mr. Tucker went into the boy's room to talk with him before he fell asleep. Ms. Sanders decided to check on what they were doing and saw that Mr. Tucker "had his gun out." Ms. Sanders asked Mr. Tucker to leave her son's room, and the two went to the living room to talk. Mr. Tucker inquired whether Ms. Sanders had seen Mr. Adams. She replied, "no" and Mr. Tucker left her residence.

Eyewitness Tracey Washington, identified Mr. Tucker as her "Godbrother" and Mr. Adams as a person she had known for the past two or three years. Approximately eight months before his murder, Ms. Washington saw Mr. Adams walk up to Mr. Tucker, "put a gun to his head," and heard him utter a derogatory greet-

---

**2.** Recodified at § 22–4504(b) (2001).

**3.** Recodified at § 22–4504(a) (2001).

**4.** Recodified at D.C.Code § 7–2502.01 (2001).

**5.** Recodified at § 7–2506.01(3) (2001).

ing. On the night of Mr. Adams' murder, Ms. Washington was present during the crap game, which took place in a well lit courtyard on Second Street, Southwest. She testified that both men left the game—first Mr. Tucker and then Mr. Adams. While Mr. Adams was standing at a fence near the site of the game, Mr. Tucker walked over to him and words were uttered but Ms. Washington "couldn't really hear the words that he said to him at first." She "just heard gunshots" and Mr. Adams "tried to run," but "he fell." Mr. Tucker had started to walk away, then turned around and saw Mr. Adams "lifting his head." He returned, voiced a derogatory appellation and added, "You're not dead yet?" He stood over Mr. Adams and "just kept on shooting him." Mr. Tucker got into his car and drove away.

## ANALYSIS

Mr. Tucker contends that the trial court erred by refusing to compel the government to produce alleged *Brady* [6] material, and thus violated his constitutional due process rights because he was "precluded ... from cross-examining Ms. Washington regarding the accuracy of her testimony in the unrelated matter," her bias and lack of credibility, and her decision to "provide[ ] false information in order to get the police to look the other way as to her own illegal drug activities." The alleged *Brady* material consisted of a transcript of Ms. Washington's grand jury testimony in another case. There, Ms. Washington incorrectly identified an individual as a person who committed a murder. The government never indicted that individual on a charge of murder. Mr. Tucker claims there is a reasonable probability that the outcome of his case would have been different had he been able to introduce and use the alleged *Brady* material in cross-examination of

Ms. Washington. The government argues there was no error because "the pertinent information in the [grand jury] transcript was disclosed to counsel, the matters contained therein did not constitute *Brady* information, and the trial court allowed [Mr. Tucker's] counsel to conduct an extensive and probing cross-examination of [Ms.] Washington."

The controversy surrounds grand jury testimony by Ms. Washington in a case involving a homicide that occurred some ten years prior to Mr. Adams' murder. In that case, Tyrone Brawner was accused of murdering Larry Wright. Ms. Washington testified that Mr. Brawner was like a "brother" to her and that he shot Mr. Wright. Further police investigation established that Mr. Brawner was not the shooter, and another individual was tried for Mr. Brawner's murder. Prior to trial in this case, defense counsel asked the government about *Brady* material. The government filed a response to the request on May 11, 2001, which stated in part:

Trac[e]y Washington testified in the Grand jury in a 1989 homicide case against Tyrone Brawner.... The case against Tyrone Brawner originated from a murder that took place on June 29, 1989.... The victim in the murder was Larry Wright. Assistant United States Attorney Roy McCleese investigated the case and presented it to the Grand Jury in 1989 and 1990. In the grand jury, Trac[e]y Washington identified Tyrone Brawner as the person she saw kill Larry Wright. After investigating the case, however, Assistant U.S. Attorney McCleese dismissed the case before indictment because of insufficient evidence to return the indictment....

Assistant United States Attorney Douglas Klein was not aware of Trac[e]y

---

6. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Washington's involvement as a witness to the 1989 murder until about two weeks ago when defense counsel informed him of the information. In response to the defendant's motion, and in compliance with the *Brady* request, the United States turns over the following police documents related to the 1989 murder; PD 163, PD 251 and PD 252, photo array, and arrest warrant. Trac[e]y Washington was the witness [o]n which the United States based the arrest warrant for Mr. Brawner in 1989.

The government asked the trial court to "conduct a short hearing on the *Brady* issue prior to the selection of the jury in the case." Defense counsel filed a motion to compel disclosure of Ms. Washington's grand jury testimony in the Brawner matter.

At a hearing on March 21, 2001, defense counsel made the following proffer:

It appears to me that [Ms. Washington] was certain in the grand jury of her identification [of Mr. Brawner] and, in fact ... the government has told me that in the grand jury, she indicated that Tyrone Brawner was like a brother to her and so she was certain about her identification of him.

Based, I think, on her ... report of being a witness in that murder, the government secured an indictment, I believe, of Tyrone Brawner. At the very least, he was arrested on an arrest warrant and remained incarcerated for some time. It wasn't until later that they had to dismiss the charge against Mr. Brawner because it was discovered that Tracey Washington had either lied or been mistaken in the grand jury.

The government pointed out that Ms. Washington "identified Mr. Brawner primarily from clothing and her familiarity basically with Mr. Brawner ... just the way he looked, but primarily ... she used

clothing." The government challenged the notion that Ms. Washington had lied before the grand jury in the Brawner matter and insisted that she was simply "mistaken." In addition, the government revealed that Ms. Washington had been interviewed by the government in 1998, that the Brawner matter had come up, and that Ms. Washington stated that "she based her [identification] primarily on the clothing that Mr. Brawner was wearing, that she wasn't sure whether Mr. Brawner was in fact the shooter, but ... he was there, she just wasn't sure." Defense counsel proffered that as a result of her 1998 contact with the government about the Brawner matter, Ms. Washington "might have understood that she would be the subject of a perjury charge, [and that] goes to her bias in this case." Defense counsel added that because Ms. Washington had previously provided information to the police, she was aware of benefits that she could receive, and thus the defense should be able to inquire about any such benefits received in this case.

The trial court reviewed Ms. Washington's 1990 grand jury testimony prior to making its ruling. After reviewing that testimony, the trial court stated:

I think [defense counsel's] final proffer ... is sufficient to question [Ms. Washington] about whether she's providing information against your client because she hopes the police will turn their back on her criminal activity, based on your proffer.

If she believes she is getting something in exchange for her testimony, I think that's proper cross-examination, but insofar as her identification of Tyrone Brawner in a 1989 murder, I don't believe your proffer on bias hits the mark. I think that it's not demonstrated that there was—could be a legitimate fear of prosecution for perjury, and

there is insufficient evidence that she in fact lied before the grand jury.

So I'm not going to allow you to cross-examine on that on either credibility or bias proffers, but to the extent she might be receiving benefits now for having identified your client, based on the fact that she identified or cooperated earlier and received benefits, that will be allowed.

█ "The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense." *Robinson v. United States,* 825 A.2d 318, 324 (D.C.2003). Specifically, *Brady* requires the government "to disclose to the defense, upon request, evidence in its possession that is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Cook v. United States,* 828 A.2d 194, 202 (D.C.2003) (citing *Farley v. United States,* 694 A.2d 887, 889 (D.C. 1997) (quoting *Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194)) (internal quotation marks omitted). "Favorable evidence is 'material' within the meaning of the *Brady* doctrine, however, only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *Rowland v. United States,* 840 A.2d 664, 687 (D.C.2004) (citing *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (internal quotation marks omitted). "Thus, 'strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'" *Id.* (quoting *Strickler, supra,* 527 U.S. at 282, 119 S.Ct. 1936).

Mr. Tucker urges us to follow *Bennett v. United States,* 797 A.2d 1251 (D.C.2002), a case in which the government refused to turn over redacted parts of a government witness' grand jury testimony. The redacted parts "apparently showed that [the witness] had lied, either to the police or to the grand jury, about a murder which she ultimately claimed to have witnessed" because "she gave two irreconcilable accounts relating to the same murder." *Id.* at 1256. The irreconcilable accounts were given to the police and the grand jury six months prior to the murder involved in *Bennett.* That is not the case here. Ms. Washington's grand jury testimony relating to the Brawner matter took place approximately ten years prior to the murder in this case. Significantly, the redacted portions of the grand jury testimony in *Bennett* apparently contained information showing that the government witness indeed lied either to the police or to the grand jury. Here, however, the trial judge found nothing in Ms. Washington's grand jury testimony, which the judge read before making her ruling, to support the defense contention that Ms. Washington lied in the Brawner matter.

Our review of Ms. Washington's 1990 grand jury testimony, which was submitted to this court under seal, leads us to agree with the trial court that nothing in that grand jury testimony would have cast doubt upon her identification of Mr. Tucker as the assailant in this case, nor would have helped to establish that Ms. Washington lied at that time and hence was vulnerable to a perjury charge. The transcript supports the government's contention that Ms. Washington simply was mistaken in her identification of Mr. Brawner as the shooter, and did not identify Mr. Brawner with any degree of certainty or specificity. In addition the government determined during a 1998 interview with Ms. Brawner

that she had identified Mr. Brawner by his clothing, and was not certain of her identification.

■ As such, and given the fact that the government disclosed details and documents about the Brawner matter to the defense before trial, we cannot say that Ms. Washington's 1990 grand jury testimony was "material" to Mr. Tucker's defense in this case because we see no "reasonable probability that, had [the transcript of that testimony] been disclosed to the defense, the result of the proceedings would have been different." *Rowland, supra,* 840 A.2d at 687 (citing *Strickler, supra,* 527 U.S. at 280, 119 S.Ct. 1936) (quoting *Bagley, supra,* 473 U.S. at 682, 105 S.Ct. 3375); *see also Matthews v. United States,* 629 A.2d 1185, 1199–1200 (D.C.1993) (where "the prosecutor disclosed the substance of [the grand jury testimony] . . . there is no basis to conclude that the government improperly withheld the statement, or that appellant was significantly prejudiced.").

■ We of course recognize that the Sixth Amendment to the Constitution guarantees a defendant the right to cross-examine witnesses against him, *see Springer v. United States,* 388 A.2d 846, 854 (D.C.1978), but that right may not be exercised "in whatever way and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). As we have said previously, "[the] extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Springer, supra,* 388 A.2d at 854 (quoting *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931)). The trial court gave careful thought to whether

or not Mr. Tucker should be allowed to cross-examine Ms. Washington on her 1990 grand jury testimony, and determined that this avenue of cross-examination should be foreclosed. Although Ms. Washington was an important government witness, we cannot say that "the value [of the 1990 grand jury transcript would have been significant] in undermining [her] credibility," *Bennett, supra,* 797 A.2d at 1256, or her identification of Mr. Tucker as the shooter in this case. This is particularly true where, as here, (1) defense counsel had other opportunities to show bias and lack of credibility on Ms. Washington's part, including use of Mr. Carter's assertion that she was a drug dealer, and use of her contacts with the police, especially Detective Fulton; (2) Mr. Tucker failed to make an adequate showing that Ms. Washington's 1990 testimony before the grand jury was fabricated, *see Roundtree v. United States,* 581 A.2d 315, 322 (D.C. 1990) ("where a witness has previously made allegations similar to those . . . at trial, cross-examination about those prior allegations is constitutionally mandated only where they are 'shown convincingly' to be false") (citations omitted); (3) the relevance and the probative value of the 1990 grand jury testimony to Ms. Washington's bias and credibility were not substantiated because the trial court correctly found that "there is insufficient evidence that [Ms. Washington] in fact lied before the [1990] grand jury"; and (4) there was another eyewitness to the murder of Mr. Adams, Ms. Sanders, whose testimony and character were not impeached to any significant extent.[7] Therefore, we hold that the error in curtailing cross-examination about Ms. Washington's 1990 grand jury

---

7. Defense counsel attempted to show that Ms. Sanders would give testimony favorable to the government because she received witness vouchers in this case and another, and be-cause Detective Fulton had offered to help her move and to obtain a "Section 8" housing certificate.

testimony, if any, was harmless beyond a reasonable doubt. *See Flores v. United States,* 698 A.2d 474, 479 (D.C.1997).

Mr. Tucker also claims that "the cross-examination of Mr. Carter was improperly curtailed." Defense counsel informed the trial court that she wished to ask government witness Troy Carter about the dismissal of an assault with intent to kill charge against his brother. Counsel proffered that "the case could still be brought back against [Mr. Carter's] brother," and that "so long as he is cooperating [in the case against Mr. Tucker], his brother benefits." The trial court responded that "in assessing whether there is a good-faith basis [for the cross-examination], I want to know the circumstances of the dismissal." Mr. Carter has more than one brother and the court also asked which of the Carter brothers was involved. Defense counsel named Jasper Carter. The prosecutor asserted that he did not know a Carter brother named Jasper and that defense counsel was "simply speculating." After defense counsel told the judge she had the file of Jasper Carter, the judge ruled: "I am going to allow [defense counsel] to question [Troy Carter] about his possible belief that a case can be re-brought against his brother or against him, but not the details of the case because I don't want there to be mudslinging against witnesses.... You can get out the alleged bias, but not the underlying case or ... the charge."

Later on the same day, the prosecutor informed the trial court that he had additional information about the case involving Jasper Carter, who was Troy Carter's cousin, not his brother. Because of "an exculpatory statement from the primary witness," the government doubted that defense counsel had a "good faith basis to believe that Jasper Carter even committed a crime ..., and there has never been any allegation that Troy Carter was involved in any way." In the face of this information, defense counsel asserted, "it might have been not Jasper but another one of the Carters, and there are many of them—Troy, Keion, Rob." When the trial judge asked whether defense counsel was "able to proffer there is a good faith basis to believe that Mr. Carter believes that Officer Fulton had something to do with dismissing the case," defense counsel responded:

> Your Honor, here's what I'm able to proffer. That Detective Fulton was involved in the investigation. That it's completely within the Government's, including Detective Fulton's power to bring this case back should they determine the [correct] Carter to charge; that it would go to Troy Carter's bias to curry favor with the government to avoid that happening to participate in this prosecution.

The trial court disallowed the proposed cross-examination saying: "I think it's too speculative. I mean Officer Fulton can charge him with anything, whether it's been brought in the first instance or not.... It's just too speculative." The court also found "too speculative" and lacking in "a good faith basis" defense counsel's proposal to ask "[Troy Carter] whether he is aware that this serious incident occurred and that he might have been one of the Carters ... who the Government intended to prosecute at the time or even now."

█ We are satisfied that the trial court properly foreclosed this line of bias cross-examination, and there was no Sixth Amendment violation. Defense counsel failed to proffer " 'some facts which support a genuine belief that [Troy Carter] [was] biased in the manner asserted.' " *Brown v. United States,* 740 A.2d 533, 536 (D.C.1999) (quoting *Jones v. United States,*

516 A.2d 513, 517 (1986)). Not only was defense counsel mistaken about Jasper Carter's relationship to Troy Carter, but he could not name the Carter brother who allegedly was involved. Moreover, the government made clear that Troy Carter was not implicated in the incident cited by defense counsel; and no facts were proffered to support a good faith belief that he was courting the favor of Detective Fulton or that Officer Fulton was responsible for dismissing the charge against Jasper Carter.

Finally, we summarily address Mr. Tucker's argument that the trial court erred by giving the lesser-included second-degree murder instruction "[b]ecause there was no evidence that the murder of Mr. Adams was anything but first degree murder." The government contends that because "the jury is absolutely free to disregard any portion of the government's evidence or a witness's testimony that arguably supported a finding of first degree murder," the lesser-included second-degree murder instruction was appropriate.

■■■ "A lesser-included offense instruction is proper where (1) the lesser included offense consists of 'some, but not every element of the greater offense'"; and "(2) the evidence is sufficient 'to support the lesser charge.'" *Woodard v. United States,* 738 A.2d 254, 261 (D.C. 1999) (citation omitted). "Any evidence, however weak, is sufficient to support a lesser-included instruction so long as a jury could rationally convict on the lesser-included offense after crediting the evidence." *Id.* (citing *Wilson v. United States,* 711 A.2d 75, 77 (D.C.1998) (per curiam) (other citations omitted)).

In requesting a second-degree murder instruction, the government explained that "it easily could be argued that Mr. Tucker snapped ..., that there was an ongoing beef, [t]hat he really didn't contemplate killing Mr. Adams that day or at any point, but at some point something snapped and then it set him off and he went to go shoot Mr. Adams." Defense counsel opposed a second-degree murder instruction on the ground that "there is very little evidence, or no evidence ... to support a lesser offense." The trial court declared: "The jury instructions build in a second degree, and I think it's because jurors struggle over the concept of deliberation and premeditation. So, I will give second degree."

■■■ Based on the legal principles enunciated in *Woodard, supra,* and the evidence presented at trial, while the jury could conclude reasonably that testimony from all three eyewitnesses showed malice on Mr. Tucker's part, Mr. Carter's and Ms. Washington's testimony presented some evidence which might lead reasonable jurors to conclude that there was no premeditation. Mr. Carter testified that Mr. Tucker left the crap game without picking up his money, and Ms. Washington stated that she "couldn't hear the words that [Mr. Tucker] said to [Mr. Adams]" before any shots were fired. This testimony reasonably could cause jurors to "retain[ ] a doubt as to premeditation and deliberation," even though others might be convinced that the evidence of premeditation was by no means weak. *Shuler v. United States,* 677 A.2d 1014, 1018 (D.C. 1996). Yet, as we said in *Shuler,* "the weight of the evidence supporting the [lesser-included] instruction is immaterial; as long as the jury could rationally convict on the lesser-included offense after crediting the evidence, the court must give the instruction no matter how inclined it might be to discount that evidence." *Id.* at 1017. In short, we discern no error in the judge's decision to give a second-degree murder instruction in response to the request of the government.[8]

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

8. In his final argument, Mr. Tucker points to several other alleged errors which he claims conveyed to jurors the erroneous impression that "Mr. Tucker had an obligation to prove his [defense] theory to the jury." We discern no errors as described and no indication that the trial court shifted the burden of proof to Mr. Tucker.