Willie T. SMITH, Appellant,

v.

UNITED STATES, Appellee.

No. 12172.

District of Columbia Court of Appeals.

Argued March 15, 1978.

Decided Aug. 1, 1978.

Robert F. Muse, Public Defender Service, Washington, D. C., for appellant.

Ann P. Gailis, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell and Frederick A. Douglas, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and HARRIS, Associate Judges.

KERN, Associate Judge:

■ Appellant challenges his conviction for armed burglary, D.C.Code 1973, §§ 22–1801, –3202, armed robbery, D.C.Code 1973, §§ 22–2901, –3202, and assault, D.C.Code 1973, § 22–502, after a trial by jury, on the ground that the trial court committed reversible error (1) by refusing to permit a line of cross-examination which might have demonstrated bias on the part of the complaining witness, and (2) by refusing to impose a sanction against the government at trial for what he contends was a violation of the Jencks Act, 18 U.S.C. § 3500 *et al.; viz.,* the government's failure to preserve a policeman's rough notes made during the investigation of the crime.[1]

Evidence adduced at trial indicates that in the early morning hours of March 21, 1976, Alma Bonds was awakened by Ann Smith, another tenant of the same building, knocking on her apartment door. After Alma Bonds admitted her neighbor, she learned that Ann Smith wished to purchase

---

1. We deem the trial court's ruling that the notes taken were not within the purview of the Jencks Act to be correct on this record.

some cigarettes.[2] Although Ms. Bonds had no cigarettes to sell, Ann Smith remained in the apartment for approximately ten minutes, and attempted to engage her in a conversation. Finally, in order to indicate that she wished Ann Smith to depart, Alma Bonds opened the door to her apartment. As soon as the door was opened, an intruder whom Ms. Bonds later identified as appellant, forced his way into her apartment. The assailant held Alma Bonds by her collar, demanded her money, threatened one of her children at gunpoint, and struck her repeatedly in the face. Fearing her life, Ms. Bonds pretended to lose consciousness and fell to the floor.[3] The assailant, with the assistance of Ann Smith, then ransacked the apartment prior to his departure with some of the complainant's more valuable personal property. From her position on the floor, Alma Bonds had the opportunity to surreptitiously observe the intruder as he rummaged through her belongings in the well-lighted apartment.

Alma Bonds did not let Ann Smith leave her apartment after the assailant's departure. Although Ms. Bonds testified that she recognized appellant as her attacker[4] and knew his nickname, she did not communicate this information to the investigating officer during the initial interview because of her fear that she might be killed if she identified appellant in Ann Smith's presence.[5] Instead, she informed the investigating officer that she had closely observed her assailant and could identify him.

Later that same day, when Ann Smith was not present, Alma Bonds telephoned Detective Roberts of the Metropolitan Police Department, whom she had known for approximately one year. Although the detective was not assigned to her case, she told him she had been robbed and that Ann Smith's boyfriend was the perpetrator. During this conversation, Detective Roberts informed her that he would take no action until the report of the offense was transmitted to him.

A few weeks after the offense, Ms. Bonds encountered, outside her apartment, the officer who first responded to the crime scene. During this coincidental meeting, she told the policeman that she knew the nickname of her assailant. During this same time frame; viz., mid-April 1976, Alma Bonds also informed Detective Roberts that her assailant was "Willie Brown," the son of "one armed Brown," a resident of the neighborhood. Further investigation by Detective Roberts revealed that appellant was known by the name of "Willie Brown." Based on this information, the detective prepared an array of 12 photographs, which included a photograph of appellant. From this array, Ms. Bonds positively identified appellant as her assailant, stating "this is the person who committed the offense. This is Willie." Ms. Bonds subsequently identified appellant at a police lineup.[6]

2. Alma Bonds testified that she was engaged in the illegal sale of liquor and cigarettes to her neighbors.

3. The complainant testified she feigned unconsciousness because "I decided that I've got to go out on him to make him think that I was out. So I just dropped right out on the floor . . . [because I thought] if he knows that I know him and he's doing this, he's going to kill me."

4. Alma Bonds testified that appellant lived nearby and that she had frequently observed him about the neighborhood.

5. The investigating officer testified that Alma Bonds was "nervous" during the interview he conducted at the scene of the crime. Although it is undisputed that Ann Smith was present throughout the officer's interview with the complainant while he was writing his report, the officer testified that he was alone with Alma Bonds for 10 or 15 minutes following Ann Smith's departure. During this period, according to the officer, Alma Bonds did not indicate that she recognized her assailant. Alma Bonds' testimony contradicted that of the investigating officer on this point; viz., she stated that on the night of the offense, she was never alone with the investigating officer and that Ann Smith's presence deterred her from identifying her assailant.

6. The victim's 10-year-old daughter, Shelby Bonds, who was present during the robbery, also attended the lineup but identified a person other than the appellant. However, at trial, Shelby Bonds' testimony corroborated, in some detail, the sequence of events of the robbery as outlined by her mother. Both Shelby Bonds

In order to understand fully appellant's complaint that the trial court committed reversible error by prohibiting defense counsel's exploration of possible bias on the part of the complainant, certain other evidence adduced at trial must be summarized. Alma Bonds testified that she had been acquainted with Detective Roberts for about one year preceding the robbery and that the detective had spoken with her on several occasions during this period. She also testified that it was her belief that Detective Roberts suspected her of involvement in the illegal sale of cigarettes and liquor, although he had never been present when such sales occurred.[7] The detective testified that information indicating that Ms. Bonds might be engaged in bootlegging had come to his attention, and that he had visited her on numerous occasions in an attempt to obtain evidence of such sales. Detective Roberts also testified that he had notified the appropriate investigative units of the Metropolitan Police Department that Alma Bonds was rumored to be involved in violations of the Alcohol Beverage Control Act.

When defense counsel attempted to question both Alma Bonds and Detective Roberts to determine whether the complainant had supplied information to the detective in the past, the trial court sustained the government's objection to this line of questioning.

Appellant contends that:

[T]he main factual issue in the trial below was the credibility and reliability of the one witness who identified appellant— Ms. Alma Bonds.[8]

\*　\*　\*　\*　\*　\*

and her mother testified that the assailant was tall, dark skinned, and had some facial hair.

7. Detective Roberts testified that he had known Alma Bonds for approximately a year and a half and that he had visited her "on the average of once a month." He also testified that he did not consider her to be "a personal friend." It might be inferred that the purpose for these visits was the detective's desire to investigate rumors concerning Alma Bonds' activities as a bootlegger.

8. Evidence adduced at trial clearly demonstrated that the complaining witness had been the

[One attack on the complainant's credibility was a defense attempt] to show the jury that Ms. Bonds' testimony should be viewed skeptically inasmuch as she was a police informer　.　.　..

\*　\*　\*　\*　\*　\*

Establishing such a relationship would have revealed to the jury a possible bias on the part of the complainant, and demonstrated that she was not simply the neutral and disinterested witness the government held her out to be.

In essence, appellant contends that this line of inquiry, if permitted by the trial court, would have undermined the credibility of the complainant in two distinct ways: first, because of her relationship with the police as an informer, she would naturally possess a *general* bias *in favor* of the government due to her need to curry favor with the authorities, presumably in exchange for their overlooking her own illegal conduct; and second, because of her status as a police informant, *viz.,* one held in low regard by the general public due to the very nature of her activities, the jury would have tended to view her testimony with skepticism.

■ It is undisputed that among the appropriate objectives of cross-examination is the impeachment of a witness by demonstrating bias.[9] It has been stated that bias of a witness is "always relevant." *Best v. United States,* D.C.App., 328 A.2d 378, 381 (1974), *quoting Villaroman v. United States,* 87 U.S.App.D.C. 240, 241, 184 F.2d 261, 262 (1950).

A recent decision of this court, *Springer v. United States,* D.C.App., 388 A.2d 846

victim of a crime, and that appellant was seen in the neighborhood an hour after the offense. Thus, the only question for the jury was the identity of the perpetrator.

9. *Springer v. United States,* D.C.App., 388 A.2d 846 at 856 (decided June 6, 1978); *Webb v. United States,* D.C.App., 388 A.2d 857 (decided June 6, 1978); *Flecher v. United States,* D.C. App., 358 A.2d 322, 323–324 (1976); *Rhodes v. United States,* D.C.App., 354 A.2d 863, 865 (1976); *Hyman v. United States,* D.C.App., 342 A.2d 43, 44–45 (1975).

(decided June 6, 1978), has outlined the applicable standards for appellant evaluation of claims that a trial court has unduly restricted cross-examination of a critical prosecution witness in derogation of the accused's Sixth Amendment right to confrontation:

[I]n reviewing claims of error based upon the trial court's excessive restriction of cross-examination, the standard of review employed by this court will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial. We will first examine the record to determine whether any such error committed is of constitutional dimension. . . . Where . . . the record shows that the trial court's curtailment of cross-examination rises to the level of abridgment of the defendant's constitutional right to effective cross-examination, we must then decide whether such constitutional error by the trial court is of such magnitude as to require reversal per se, . . . or whether such error may be considered harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). [*Id.* at 855; emphasis added.]

We turn now to appellant's first assignment of error; *viz.,* the trial court's refusal to permit cross-examination of the complainant and Detective Roberts concerning her possible role as an informant[10] in other cases which, it is asserted, might have demonstrated *her need to curry favor with the authorities.*[11]

Our review of the record persuades us that the trial court committed error of a constitutional dimension when it impermissibly restricted the scope of defense cross-examination of the detective and the complainant insofar as such interrogation was designed to elicit facts which might have demonstrated the complainant's desire to ingratiate herself with the police. However, this constitutional error was harmless under the circumstances here. The relevant standard of review in a case of constitutional error because of curtailment of cross-examination was stated in *Springer v. United States, supra* at 855:

If . . . the trial court has permitted *some* cross-examination so that the jury has sufficient information from which to infer bias (should it so choose), this court will evaluate error by application of the harmless constitutional error test of *Chapman v. California, supra.* To hold harmless such error in curtailing constitutionally-protected cross-examina-

---

**10.** There is no indication in the record that the complaining witness was, in fact, an informant. One explanation for Detective Roberts' interest in Alma Bonds *which is supported by the record* was his desire to gather evidence against her as an unlawful vendor of liquor and cigarettes. Moreover, Detective Roberts appears to have given no special attention to the investigation of this offense, thereby suggesting that no special relationship existed between the complaining witness and him. Indeed, when contacted by the complainant shortly after the offense, Detective Roberts indicated he would take no action until the police report reached his office in due course. This response, coupled with the fact that he reported Alma Bonds to officers charged with investigating the unlawful sale of liquor and cigarettes, hardly suggests that a special relationship existed between them.

**11.** Considered on its merits, the proposition that the complainant was willing to perjure herself by falsely accusing appellant of the offense, and thus win favor with the authorities, is unpersuasive. Ann Smith, purportedly appellant's girlfriend, and Shelby Bonds also witnessed the offense. Since Ann Smith was not called by either side to testify at trial, we may not speculate concerning her testimony; however, it seems unlikely that had complainant consciously decided to fabricate an identification of her assailant and falsely identify appellant, she would select someone *she knew to be* well known to the only other adult witness to the offense (a) who was able to view the intruder more comprehensively than she, and (b) who, due to her relationship with the accused, would be inclined to expose any deceit. The probable result of such a transparent attempt at deception would be the serious erosion of the complainant's credibility, a circumstance hardly calculated to "curry favor" with the authorities.

tion, it must be clear beyond a reasonable doubt . . . that the defendant would have been convicted without the witness' testimony, or . . . that the restricted line of inquiry would not have weakened the impact of the witness' testimony. [*Id.* at 856; emphasis in original.]

Application of this standard to the facts of the instant case requires close examination of the record. As we begin our analysis, we must bear in mind the Supreme Court's admonition that appellate courts must "guard against the magnification on appeal of instances which were of little importance in their [trial] setting." *Glasser v. United States,* 315 U.S. 60, 83, 62 S.Ct. 457, 471, 86 L.Ed. 680 (1942).

We note at the outset that there was evidence presented at trial from which a jury could have concluded that the complaining witness felt a need to curry favor with Detective Roberts and hence was generally biased in favor of the government; namely, testimony of *her* belief in *his* awareness of her illegal liquor and cigarette sales. This airing of *that* evidence of bias before the jury may be the explanation of the fact that while appellant asserts on appeal that the complainant's credibility was "the main factual issue in the trial below," defense counsel's closing argument focused at trial *exclusively* on the victim's opportunity to observe her assailant while prone on the apartment floor and on her failure to identify her assailant on the night of the offense. Similarly significant is the fact that defense counsel's closing argument completely omits any reference to the complainant's own admission on the stand that she was engaged in the illegal sale of liquor and cigarettes. This silence in the record is particularly significant in light of the prosecution's closing argument that the fact Alma Bonds was a bootlegger made her testimony more *reliable*:

But there's something else that was running along with this case. There's Miss Alma Bonds who told you . . . she was operating, she was selling, she was keeping whiskey, selling it to the public illegally. The defense brought that out. It was illegal. She knew it was illegal.

And you can bet your bottom dollar the members of the community knew it was illegal also. So what do you have, ladies and gentlemen? You have a woman who's committing . . . a crime who then becomes the victim of a crime. . . Isn't she really the best person to be set up, the best person to be brutalized, the best person to be robbed by people who know her?

They know that she's committing a crime. They know that it's very dangerous for her to even go to the police because to do so, she has to, in effect, say "Well, look, I was committing a crime also." Knowing that . . . is it unreasonable to believe that a person who knew her personally who lived in the same community . . . to be the person who robbed her.

In effect, the record reflects that the line of inquiry now categorized by appellant as "crucial" to his defense was of relatively little moment in the trial below.[12] Neither the victim's bias nor lack of trustworthiness was mentioned by defense counsel during closing argument to the jury. Nor was there any protest by defense counsel at trial when her investigation of this purportedly critical topic was summarily curtailed by the trial court on two separate occasions during cross-examination. Neither did defense counsel, once the government's objection to this line of questioning was sustained, make any proffer to the trial court explaining in what way the complainant's alleged informant role in other cases ultimately related to the question of the appel-

12. A fair reading of defense counsel's cross-examination of the complaining witness indicates that a majority of the questioning concerned her ability to observe her assailant. The remainder of the interrogation emphasizes Alma Bonds' failure to inform the police on the night of the offense of the identity of her attacker. Only a few questions were posed concerning the complainant's illegal activities and whether Detective Roberts was aware of these activities.

lant's guilt or innocence in this case where she was the victim of the crime. While a *detailed* proffer is not required in cases such as this, counsel should attempt to highlight what to his mind is a critical avenue of examination, the relevance of which is not apparent to the trial court. Certainly, we can assume the defense counsel, in her on-the-spot evaluation of any possible prejudice stemming from the curtailment of her exploratory question regarding bias, must have concluded that this line of inquiry, or any related questions, were fruitless since (1) she lodged no protest to the court's prohibition of such questions on two separate occasions, (2) she advanced no proffer whatsoever to the court in any attempt to explain the necessity of this cross-examination, and (3) following each ruling, defense counsel promptly moved on to another line of interrogation.

On the facts of this case, in light of the evidence adduced at trial that (1) the complainant believed the police were aware of her illegal activities, (2) her admitted status as a lawbreaker and (3) the fact she was the victim of a violent assault, we are persuaded that the trial court's erroneous restriction of a relevant defense endeavor was harmless beyond a reasonable doubt. *Chapman v. California, supra. See Springer v. United States, supra* at 856; *Webb v. United States, supra.*

Appellant's second contention focuses on the fact that had cross-examination revealed the complainant's informant *status,* the jury might have tended to view her testimony with skepticism due to the very nature of her activities. Appellant further contends that since cross-examination

would have been appropriate on this second basis, the curtailment of this inquiry *in limine* constituted per se reversible error. *Springer v. United States, supra* at 856; *Webb v. United States, supra; Gillespie v. United States,* D.C.App., 368 A.2d 1136 (1977). The record in the instant case contains no testimony demonstrating that the complainant was, in fact, an informant, unlike the situation previously discussed where the record contained statements of the complainant and the detective from which the jury could have concluded that Alma Bonds was inclined to curry favor with police.

 While we agree with the general proposition that abridgement of the accused's right to effective cross-examination can be so pronounced as to require reversal per se, *Springer v. United States, supra* at 856, we observe that:

> . . . the trial judge may always limit cross-examination . . . to prevent inquiry into matters having little relevance or probative value to the issues raised at trial. [*Id.* at 854.]

 The fact the complainant may have served as a police informant [13] in other cases not involving appellant was not relevant here, in the sense appellant contends, given the fact that Alma Bonds was the victim of a brutal assault and robbery. It is established that only evidentiary items possessing a potential for connoting bias are admissible to impeach a witness before the jury. *Austin v. United States,* 135 U.S. App.D.C. 240, 243, 418 F.2d 456, 459 (1969). Here, appellant does not contend that the complainant harbored a bias against him

---

**13.** In a literal sense, the complaining witness was not serving as an "informant" in this case since she was the victim of the crime she reported. Alma Bonds reported this incident as would any citizen who had been assaulted and robbed. Although appellant contends otherwise, we conclude that her status in this case is more akin to that of a crime victim who made a prompt report of the offense to the police. In the prototypical police-informant situation, the informer is usually (1) a participant in the criminal act who, for reasons of his own, decides to betray his companions, or (2) an individual who is part of the criminal mileau who is the

purveyor of information concerning the criminal activities of others. Appellant does not contend that Alma Bonds played either role in this case. Even if Alma Bonds may have served as an informant in *other* cases, here her conduct cannot be accurately categorized as that of an informant. Whatever concerns the complainant may have had in other cases would have been outweighed by her concern, as the victim of a particularly brutal assault upon her and her daughter, with the apprehension and punishment of her attacker and the possible recovery of her property.

personally due to factors not explored at trial. Accordingly, the issue becomes whether if the complainant had in fact supplied information to the police about other, unrelated crimes before this incident occurred, would that fact; *viz.*, her informant status, have eroded her credibility in a case where she was a crime victim. In light of our conclusion that the complainant's status here is that of a crime victim rather than that of a purveyor of information regarding the criminal activities of others, and in light of the further fact that the jury had before it Alma Bonds' admission she engaged in the after hours sale of cigarettes and liquor contrary to law, we conclude that evidence of her possible status as a police informant in other cases was not relevant here.[14] Thus, the trial court's ruling during trial was not an abridgement of appellant's Sixth Amendment right and the judgment of conviction must be and is

*Affirmed.*

HARRIS, J., concurs in the result.

14. The fact the complainant admitted she was engaged in bootlegging could have formed a basis for a defense argument that as an admitted lawbreaker, she was unworthy of belief. No such argument is found in the record even though the government argued that her status as a bootlegger enhanced her credibility. The fact that this information, *viz.*, she was violating the law, was more detrimental to her credibility and already existed in the record, although defense counsel failed to capitalize on it at trial, persuades us that the complainant's trustworthiness was not as significant an issue at trial as appellant now contends. Thus, even were we to conclude that evidence of Alma Bonds' role as an informant in other cases was relevant here, the fact that no attempt was made to undermine her credibility on the basis of her admissions at trial suggests the applicability of the Supreme Court's admonition in *Glasser v. United States, supra.*