Irving J. JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 84–315.

District of Columbia Court of Appeals.

Argued Oct. 31, 1985.
Decided Oct. 22, 1986.

Timothy B. Walthall, Washington, D.C., appointed by the court, for appellant.

Curtis E. Hall, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Thomas J. Tourish, Jr., and Edward J. Agee, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and BEL-SON, Associate Judge, and BURGESS, As-

sociate Judge, Superior Court of the District of Columbia.[1]

PRYOR, Chief Judge:

After a jury trial, appellant was convicted of armed robbery in violation of D.C. Code §§ 22–2901, –3202 (1981 & 1985 Supp.), and sentenced to an indeterminate term of imprisonment of six to eighteen years. On appeal, appellant claims that the trial judge erred in limiting cross-examination of a government witness, admitting testimony corroborating out-of-court identifications of appellant made by several complaining witnesses, refusing to limit the government's use, for impeachment purposes, of appellant's prior convictions, and limiting defense counsel's closing argument. Finding these claims to be without merit, we affirm.

**I**

On March 13, 1982, shortly before 4:00 a.m., Forrest Jackson was standing near a bus stop located at the corner of 8th and H Streets, N.E., just in front of a Seven-Eleven convenience store. Michelle Brown and James Moore, along with several other individuals, were sitting on a bench inside the sheltered bus stop, and Charles Price and Charlene Bray were inside the Seven-Eleven store.

At approximately 4:00 a.m., appellant walked up to Jackson and asked him if he knew "where any marijuana was." When Jackson responded negatively, appellant walked away. Jackson testified that he immediately recognized appellant, who was wearing a beige jacket and a blue shirt, because he had "seen him" on three or four prior occasions.

Several minutes later, another man, later identified as Leonard Briscoe walked up to Jackson and pointed a silver pistol at him. As Michelle Brown, James Moore, and Charles Price watched, appellant approached Jackson from behind, reached into his pants pocket, and removed his blue

leather wallet. After Briscoe had searched Jackson's wallet and belongings, he demanded that Jackson give him and appellant three gold chains that Jackson was wearing around his neck. Jackson refused and appellant punched him in the face. Jackson then broke free from the robbers and ran toward the nearby Seven-Eleven.

As Jackson ran toward the store, appellant ran down the street and away from the robbery scene. Leonard Briscoe then proceeded to rob Michelle Brown, James Moore, and Charlene Bray, who had returned to the bus stop from the Seven-Eleven as appellant ran away.

Meanwhile, Forrest Jackson and Charles Price had run into the Seven-Eleven and told Donald Bell, who was working behind the counter, about the robbery. Bell, an off-duty Metropolitan Police Officer, telephoned the police. After hearing a gunshot, Bell drew his service revolver and walked out of the Seven-Eleven toward the bus stop, where he saw Leonard Briscoe kneeling in front of Michelle Brown, James Moore, Charlene Bray and the other bus patrons. Bell ordered Briscoe to "freeze" but Briscoe turned toward him as if to fire his weapon. Bell then fired his service revolver, hitting Briscoe in the neck and Briscoe fled as the two men exchanged gunfire.

On G Street, between 7th and 8th, Leonard Briscoe fell against the rear portion of a light-colored, four-door, Chevrolet automobile parked in front of an alley. Bell noticed that there were two people inside the Chevrolet, one of whom helped Leonard Briscoe into the car. After Leonard Briscoe entered, the Chevrolet drove away at a high rate of speed. Bell returned to the Seven-Eleven, and reported the description of the car to the police.

Police Officer Frederick Lewis heard a "lookout" for a four-door Chevrolet automobile occupied by three robbery suspects shortly after 4:00 a.m. Upon hearing the lookout, Lewis drove to Capitol Hill Hospi-

---

1. Sitting by designation pursuant to D.C.Code § 11–707(a) (1981).

tal on 8th Street to see if anybody had been admitted with a gunshot wound. Upon arriving, Lewis found a four-door Chevrolet automobile parked in front of the entrance to the emergency room. Lewis noticed a large amount of blood on the rear seat and floorboard of the car and a trail of blood leading from the car to the emergency room entrance. As Lewis began to follow the trail of blood, two men—appellant and Maurice Briscoe, Leonard Briscoe's brother and appellant's codefendant—came out of the hospital at a "hurried pace." After brief questioning, appellant and Maurice Briscoe were placed under arrest.

Police Officer Michael McGraw and Sergeant Charles Bailey of the Metropolitan Police Department arrived at Capitol Hill Hospital several minutes later. The officers found a beige jacket lying on the back seat of the Chevrolet. Inside the pocket of the jacket was Forrest Jackson's blue leather wallet and a card that had been inside the wallet taken from Jackson. Also found in the car were Jackson's blue dufflebag, containing his clothing, toiletry items, and several photographs. A .32 caliber Smith and Wesson revolver was found in the middle of 8th Street, approximately two hundred feet from the hospital.[2]

Appellant and Maurice Briscoe were brought back to the scene of the robberies where a series of "show-up" identifications were conducted. None of the witnesses identified Maurice Briscoe. At the show-up, however, Forrest Jackson positively identified appellant as the man who had taken his wallet and punched him in the face. Michelle Brown and James Moore both stated that appellant "look[ed] like" one of the two men who had robbed Jackson, and Charlene Bray stated that appellant was the same height as the man who had run from the scene as she walked out of the Seven-Eleven. At trial, both Forrest Jackson and Charles Price positively identified appellant as the man in the beige jack-

et who, along with Leonard Briscoe, had robbed Jackson.

## II

Appellant's first claim on appeal is that his confrontation rights under the Sixth Amendment were violated by a ruling of the trial judge limiting cross-examination of Forrest Jackson on the issue of bias. We disagree.

During cross-examination of Forrest Jackson, appellant's counsel asked Jackson if he ever smoked marijuana. Upon gaining an admission that he had, defense counsel then asked, "And it's also a fact that on occasion you have also sold marijuana, isn't that correct?" The prosecutor objected to the question, and at an ensuing bench conference, the court asked defense counsel to proffer a basis for the question. The following colloquy occurred:

DEFENSE COUNSEL: Your Honor, the good faith basis of that question is that Mr. Jones told me that Mr. Jackson has sold him marijuana on previous occasions and that that is a motive for why he is testifying. It is bias, Your Honor.

\* \* \* \* \* \*

THE COURT: How many occasions, what, what, why would such a transaction provide a motive? I mean, even assuming it was true, why would that make him biased?

DEFENSE COUNSEL: As I understand it, Your Honor, there was something that at one point in time, there was something wrong with one of the transactions. I think it was only one transaction. And Mr. Jackson was dissatisfied with it. The way I understand it from Mr. Jones.

THE COURT: Well, you're asking whether Mr. Jackson had sold it. That doesn't—I mean he is not a dissatisfied purchaser if he is a seller.

DEFENSE COUNSEL: No, he was dissatisfied with the transaction, Your Honor.

---

**2.** At trial, Forrest Jackson and James Moore identified the revolver as being similar in ap-

pearance to the pistol that Leonard Briscoe had used during the robberies.

Appellant claims that the trial judge erred in sustaining the prosecutor's objection to this line of questioning.

 The right to cross-examine the government's witnesses is inherent in a defendant's Sixth Amendment right of confrontation. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). While it is recognized that "[The] extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court," *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed.2d 624 (1931); *see also In re C.B.N.,* 499 A.2d 1215, 1218 (D.C.1985); *Flecher v. United States,* 358 A.2d 322, 323 (D.C.), *cert. denied,* 429 U.S. 977, 97 S.Ct. 486, 50 L.Ed.2d 585 (1976); we have repeatedly stated that "bias is always a proper subject of cross-examination." *Springer v. United States,* 388 A.2d 846, 855 (D.C.1978) (quoting *Hyman v. United States,* 342 A.2d 43, 44 (D.C.1975)); *see also Villaroman v. United States,* 87 U.S. App.D.C. 240, 241, 184 F.2d 261, 262 (1950) (bias of witness is "always relevant"); *Tompkins v. United States,* 236 A.2d 443, 445 (D.C.1967) (same). Still, cross-examination of a government witness on the subject of bias must proceed in accordance with established evidentiary rules of procedure. *Cf. Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). Thus, to survive objection, the questioner must proffer "some facts which support a genuine belief" that the witness is biased in the manner asserted. *United States v. Fowler,* 151 U.S.App. D.C. 79, 81, 465 F.2d 664, 666 (1972); *see also Hazel v. United States,* 319 A.2d 136, 140 (D.C.1974) (attorney may not ask questions of witness that are "totally groundless"). In addition, the attorney must proffer facts sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias. *See Best v. United States,* 328 A.2d 378, 381–82 (D.C.1974);

*see also Hawkins v. United States,* 461 A.2d 1025, 1034 (D.C.1983), *cert. denied,* 464 U.S. 1052, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984); *Flecher v. United States, supra,* 358 A.2d at 324.

On appeal, appellant explains that the theory of bias he sought to pursue in his questioning of Forrest Jackson was that "Jackson wanted to retaliate against him for a drug transaction for which he was never paid." In support, appellant notes that this court has recognized that a witness' failure to be paid for drugs sold to a defendant is a potential source of witness bias. *See Johnson v. United States,* 418 A.2d 136, 141–42 (D.C.1980).

 Appellant's argument is unavailing, however, because his proffer was insufficient to permit the trial judge to evaluate whether the proposed line of questioning was probative of bias. Indeed, in his proffer, defense counsel never explained that Jackson had sold appellant marijuana for which he had not been paid. Rather, counsel only obliquely stated "that at one point, there was something wrong with one of the transactions. I think it was only one transaction. And Mr. Jackson was dissatisfied with it." Defense counsel never proffered any facts explaining how or why Jackson was "dissatisfied" with the alleged transaction. Absent any explanation as to how the drug transaction may have resulted in bias on the part of Mr. Jackson, appellant's claim that the trial judge abused his discretion in precluding this line of questioning fails.[3]

 In reaching this conclusion, we recognize that "[a]n exhaustive proffer is not normally a strict requirement for initiation of a line of cross-examination." *Best v. United States, supra,* 328 A.2d at 382; *see also Moss v. United States,* 368 A.2d 1131, 1135 n. 2 (D.C.1977). Nevertheless, we observe that proffers found sufficient in other cases are more ample than that present-

---

3. Defense counsel could, of course, have requested a brief recess to obtain further information from his client on the nature of the bias resulting from the drug transaction with witness Jackson.

ed here. In *Best v. United States, supra,* 328 A.2d at 382, for example, the defendant wanted to cross-examine his arresting officer on alleged bias resulting from an altercation following his arrest. The court questioned the relevancy of the line of questioning, and invited a proffer to explain its purpose. The proffer was as follows:

> Your honor, on the day of the incident this officer struck Mr. Best and put him in the hospital and he was taken to the hospital that evening. There is evidence of police brutality and it is admissible to show bias on the part of the police officer.... It's perfectly admissible to show bias.

*Id.* at 380. After erroneously concluding that an altercation following the defendant's arrest and search could not be relevant to bias, the trial judge precluded the line of questioning. On appeal, we reversed, finding the trial judge's conclusion to be error as a matter of law, and the proffer sufficient.

*Best* is distinguishable, in our view, because the proffer in that case was specific as to who was involved, what transpired, and when and where the events resulting in bias occurred. Moreover, the nature of the incident—an alleged beating—was clearly probative of the issue of bias. By contrast, the proffer in this case was specific only as to who was involved. The description of what transpired—a drug transaction over which there was dissatisfaction—was manifestly vague. In addition, no explanation was offered as to when the alleged drug transaction occurred. Indeed, counsel should have been able to explain to the court how the proposed line of inquiry was relevant to bias, and should have been able to find out more about the matter from his

client. Finally, the interaction described—a drug transaction in which appellant was the buyer—could reasonably be viewed as less probative of bias than the police brutality alleged in *Best.* Thus, we find no support in *Best, supra,* for appellant's claim that the proffer in this case was adequate.[4] *See also Smith v. United States,* 389 A.2d 1364, 1368 (D.C.1978) (court erred in restricting cross-examination of government witness where proffer clearly indicated that the witness was a government informant).

### III

At trial, Detective Joseph Kacklik recounted the out-of-court identifications of appellant made by several witnesses immediately after the robbery.[5] On appeal, appellant claims that Detective Kacklik's testimony constitutes inadmissible hearsay because several of the identifications recounted by him at trial were not definitive. We disagree.

It is well established that "extrajudicial identification testimony is admissible as independent substantive evidence of identity as long as the out-of-court declarant is available for cross-examination at trial." *Harley v. United States,* 471 A.2d 1013, 1015 (D.C.1984); *see Warren v. United States,* 436 A.2d 821, 837 (D.C.1981); *Morris v. United States,* 389 A.2d 1346, 1350 (D.C.1978). This court has approved the "admission of a victim's pretrial description of a defendant through the ... testimony of a police officer," *Harley v. United States, supra,* 471 A.2d at 1015, and has not required that the out-of-court declarant be absolutely certain of his extrajudicial identification in order for the testimony to be admitted. *See id.* at 1015–16

---

4. Through our analysis of *Best v. United States, supra,* we do not intend to suggest that counsel is required to specify "who, what, and when" in all proffers of bias. Rather, we attempt only to articulate the basis for our view that the proffer found adequate in *Best v. United States, supra,* was more ample than that presented for review here.

5. Detective Kacklik testified that Forrest Jackson positively identified appellant as the man who took his wallet, that Michelle Brown and James Moore both identified appellant as "looking like" one of the robbers, and that Charlene Bray indicated that appellant was the same height as the man she had seen run from the scene of the robbery.

(testimony that pistol shown to witness at scene of robbery "was similar in size, shape and color" to the gun used by the robber properly admitted). Moreover, we have made it clear that out-of-court identification testimony is admissible even when the witness is unable to make an in-court identification. *Rice v. United States*, 437 A.2d 582, 583 (D.C.1981) (per curiam).

■ In this case, all of the out-of-court declarants whose "show-up" identifications were recounted by Detective Kacklik testified at trial. Consequently, Detective Kacklik's extrajudicial identification testimony was properly admitted as independent substantive evidence of appellant's identity. Appellant's claim that this evidence constituted inadmissible hearsay is, therefore, without merit.

### IV

Next, appellant argues that in permitting the prosecutor to impeach him with a prior conviction for unlawful possession of a prohibited weapon, the trial judge abused his discretion by allowing the government to specify that the earlier charge involved a gun. Again, we disagree.

■ D.C.Code § 14–305(b)(2) (1981), sanctions the use of a defendant's prior convictions for impeachment purposes at trial. We have made it clear that under this provision, when a defendant takes the stand, the court "must permit the prosecutor to attack his or her credibility by introducing recent prior convictions for felonies and other crimes involving dishonesty or false statement." *Hill v. United States*, 434 A.2d 422, 429 (D.C.1981), *cert. denied*, 454 U.S. 1151, 102 S.Ct. 1020, 71 L.Ed.2d 307 (1982). Moreover, control over the proper scope of witness examination is committed to the sound discretion of the trial court. *See Middleton v. United States*, 401 A.2d 109, 126 (D.C.1979).

■ Here, the prosecutor, at a colloquy during the government's case, indicated that he intended to use a 1979 conviction for possession of a prohibited weapon to impeach appellant's credibility if he testified in his own defense. The prosecutor further stated the government's intention "to use the term 'gun' when it asks him about those prior convictions ... as opposed to just merely mentioning possession of a prohibited weapon." While conceding that the conviction could be used for impeachment purposes, appellant maintains that the prejudicial impact from mention of the gun outweighed its probative value. Appellant asserts on appeal that the error was reversible because it influenced his decision not to testify. In light of the clear statutory language authorizing the use of prior convictions for impeachment purposes, however, and the trial judge's broad authority to control the scope of cross-examination, we find no abuse of discretion in the court's ruling.[6]

### V

Finally, appellant argues that the trial court erred when it ruled, during defense counsel's closing argument, that certain of counsel's comments made in summation were "totally outside of the range of anything for the jury to consider." This claim is without merit.

■ We have repeatedly stated that counsel may not express their personal beliefs or opinions about the existence or non-existence of a particular fact or otherwise "testify" to the jury in summation. *See Villacres v. United States*, 357 A.2d 423, 426–28 (D.C.1976); *United States v. Bell*, 165 U.S.App.D.C. 146, 164–65, 506 F.2d 207, 225–26 (1974). In this case, defense counsel attempted, in his closing argument, to discredit the testimony of Charles Price by arguing that his testimony had been orchestrated by Forrest Jackson, another government witness:

> review the claim of improper impeachment with a prior conviction, a defendant must testify.").

6. *See also Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (under FED.R. EVID. 609(a), in order "to raise and preserve for

As for Mr. Price, when you're considering his testimony, keep in mind that Mr. Price when he first talked to the police, when the incident was fresh in his mind, and the police were asking him questions about what he saw, did not tell the police that his good friend Forrest Jackson had been robbed. He left that out. He did not tell the police that he recognized the man who they had brought back, and then who was being accused, he knew quite well that he was being accused of robbing his friend Forrest Jackson.

Now, I ask you, ladies and gentlemen of the jury, does that make sense? Of course, it doesn't. It would make sense that [if] a friend [ ] wants to help him, he is going to try to tell the police everything he saw regarding his friend first, then anything else that happened. But he starts with the robbery of the gunman by his—himself with the girl.

*What actually happened,* ladies and gentlemen, was Mr. Price was down at the scene nearby, saw the subsequent occurrences, did not see Mr. Jackson get robbed, as he described [it] in this statement to the police. And then later on Mr. Jackson came to him and said, didn't you see me get robbed, you must have seen me get robbed. [Emphasis added.]

Significantly, no evidence had been introduced suggesting that Price had not seen the robbery or that Jackson had suggested the robbery to him. Given this state of the record, the court could reasonably perceive defense counsel, at least in part, as attempting to testify to the jury as to facts not in evidence. Consequently, the trial court did not abuse its discretion in interrupting this portion of closing argument, and instructing the jury to disregard it. Accordingly, the conviction on appeal is

*Affirmed.*

BURGESS, Associate Judge, dissenting:

I am unable to find a sustainable basis for excluding the proposed bias cross-examination in this case. Accordingly, because I cannot find the error harmless beyond a reasonable doubt, I must vote to reverse.

Defense counsel proffered to the trial court that the complaining witness, Forrest Jackson, was biased against his client on account of a prior transaction in which Jackson sold drugs to appellant. When asked the source of his information, counsel replied that the source was his client. When asked why the complainant would be biased, counsel replied that because "something was wrong" with the transaction, the complainant was "dissatisfied." The trial court excluded the line of questioning because it was "much too thin to constitute ... bias arising from the situation [in] which the witness allegedly sold."

The government argues first that defense counsel did not "adequately explain" the basis of his question. The majority, rightly in my view, does not base its decision on this reasoning. To guard against the danger that counsel will ask "highly prejudicial questions of witnesses with the almost certain knowledge that the insinuations are false," *United States v. Pugh,* 141 U.S.App.D.C. 68, 71, 436 F.2d 222, 225 (1970), our courts have established standards for ascertaining whether or not counsel has a good faith basis for a line of cross-examination in a criminal trial. Where counsel has no foundation in fact for the question, the basis must be a "well-reasoned suspicion", not merely "an improbable flight of fancy." *Id.* at 71, 436 F.2d at 225; *Collins v. United States,* 491 A.2d 480, 487 (D.C.1985). In the present case, however, counsel did not have to rely on suspicion; he possessed a factual foundation in information from his own client. That information was sufficient to establish a good faith basis unless it was "known by counsel to be false", or "inherently incredible." *Hazel v. United States,* 319 A.2d 136, 139 (D.C.1974). The record does not show that counsel knew his information to be false. Nor is it "inherently incredible" that a drug seller, or any seller, will be dissatisfied with a transaction and develop a hostility toward the buyer arising

out of that transaction. Accordingly, counsel did proffer "some facts which support[ed] a genuine belief" that the witness was biased. *United States v. Fowler,* 151 U.S.App.D.C. 79, 81, 465 F.2d 664, 666 (1972).

The government argues that defense counsel should have explained how and why the seller was dissatisfied. This affirmative burden on defense counsel to demonstrate why his predicate is sound is inconsistent with the rule that good faith is established if a predicate, not known to be false, is not "inherently incredible."

The government also argues, and the majority agrees, that the defense did not adequately demonstrate the relevance of the proposed cross-examination. " 'Bias is always a proper subject of cross-examination.' " *Springer v. United States,* 388 A.2d 846, 855 (D.C.1978) (quoting *Hyman v. United States,* 342 A.2d 43, 44 (D.C. 1975)). The test for relevance is whether the evidence proposed to be elicited " 'possess[es] a potential for connoting bias' ". *Flecher v. United States,* 358 A.2d 322, 324 (D.C.), *cert. denied,* 429 U.S. 977, 97 S.Ct. 486, 50 L.Ed.2d 585 (1976) (quoting *Austin v. United States,* 135 U.S.App.D.C. 240, 243, 418 F.2d 456, 459 (1969)). Here, the proposed line of questioning had that potential.

The defense wanted to show that Jackson harbored an animosity toward appellant arising out of dissatisfaction with a prior drug transaction. *Johnson v. United States,* 418 A.2d 136, 141–42 (D.C.1980), recognizes the relevance of bias cross-examination where the buyer in a drug transaction develops a hostility toward the seller because he has been sold bad drugs. But bad goods are not the only source of dissatisfaction in commercial transactions, and buyers are not the only parties who may become dissatisfied. A seller might become dissatisfied with a transaction and develop a hostility toward the buyer for

failure to pay or insufficient payment, among other reasons. Thus, I believe that the situation counsel sought to explore possessed the potential for bias. As stated in 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 607[3], at 30, 32 (1982):

> *Relationships* between a party and a witness are always relevant to a showing of bias whether the relationship is based on ties of family, sex—heterosexual or homosexual—employment, business, friendship, enmity or fear. [Emphasis added.]

It is argued, however, that defense counsel did not make an adequate proffer of relevance because he did not tell the trial court how or why the seller was dissatisfied, and when and where the transaction took place. This argument again places too great a burden on defense counsel. At least since *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931), the Supreme Court has recognized that

> [c]ounsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory....

The courts in this jurisdiction have likewise emphasized this aspect of cross-examination. *Pugh,* 141 U.S.App.D.C. at 71 n. 3, 436 F.2d at 225 n. 3; *Best v. United States,* 328 A.2d 378, 382 n. 3 (D.C.1974).

We may assume that counsel did not know how or why the witness had become dissatisfied, and, therefore, could not proffer the reason to the trial court. The defendant may have known the reason and not transmitted it to counsel. Or defendant may have perceived the dissatisfaction and not understood the reason for it. But even if the cause of dissatisfaction was not known to defense counsel, curtailment of the examination was not justified. Counsel cannot always tell a court in advance the facts that exploratory cross-examination into bias may well bring to light.[1] All

---

1. A noteworthy illustration of this is *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968), where the Supreme Court found reversible error in the trial court's preclusion of cross-examination designed to learn the true name and address of a government witness.

counsel need show is the potential for bias. "[A]n important way of demonstrating a witness' bias is showing the *possibility* of hostility stemming from a previous conflict between the witness and the adverse party." *Staton v. United States*, 466 A.2d 1245, 1250 (D.C.1983) (emphasis added).

Moreover, I do not see how informing the trial court of when and where the transaction took place is a necessary predicate to bias cross-examination in this case. Where the drug transaction occurred is of no use in determining whether it gave rise to a hostile emotion. When it occurred might be useful where there is some likelihood that the incident was remote in time. Here, however, the defendant and complainant were young men. It is highly unlikely that the alleged incident was so remote as to have no bearing on the witness' credibility.

I am concerned that suggestions that counsel must necessarily possess details such as when and where something occurred, or why a person is hostile, will undermine the principle that bias cross-examination is necessarily exploratory. Requiring such amplification appears to be directed more at a concern about counsel's

good faith basis than about the relevance of the line of questioning.

Recognizing the importance of exploratory cross-examination, our court has several times rejected arguments that the defense made an inadequate proffer to show the relevance of bias cross-examination. *Best*, 328 A.2d at 382 & n. 3; *Moss v. United States*, 368 A.2d 1131, 1135 n. 2 (D.C.1977); *Gillespie v. United States*, 368 A.2d 1136, 1138 (D.C.1977). In *Best*, for example, the government argued that trial counsel had failed to show how the alleged bias of a witness was relevant to the question of guilt or innocence; the relevance was "clarifie[d]" only on closing argument and appeal. 328 A.2d at 380. This court recognized trial counsel's failure fully to articulate relevance, but observed:

> These deficiencies, however, did not justify the complete curtailment of questioning. An exhaustive proffer is not normally a strict requirement for initiation of a line of cross-examination.

*Id.* at 382; *see also Smith v. United States*, 389 A.2d 1364, 1370 (D.C.1978). I find the relevance to bias of the proposed cross-examination in the present case at least as clear as that in *Best*, if not more so.[2] Thus, I cannot agree that counsel

---

The basis for the holding was not that the name and address were important as evidence themselves but rather that they "open[ed] countless avenues of in-court examination and out-of-court investigation."

**2.** The majority misplaces reliance on *Best* as an example of a proffer of relevance more ample than the proffer here. It is true that in *Best*, counsel's proffer explicitly revealed an intent to demonstrate the arresting officer's bias by showing that he had hit the defendant at the police station after the arrest. Counsel, however, was unable to show *why* the striking would demonstrate bias, since he was unable to proffer that it was unjustified. Moreover, defense counsel was unable to proffer *how* impeaching the officer was relevant to any material issue. The key issue was whether the alleged robbery victim, a Mrs. Reid, reliably identified currency found on defendant as her own, by virtue of its folded, old and worn condition. Given that any evidence of police brutality possesses the potential for inflaming and distracting the jury, the trial *judge* understandably would have been concerned about admitting it without a proffer

demonstrating relevance. On appeal, this court acknowledged that defense counsel made an incomplete and therefore "deficien[t]" proffer by failing to show how the hitting demonstrated the officer's bias and how bias "was ultimately related to the question of guilt or innocence." 328 A.2d at 382.

Defense counsel, however, was able, after the fact, to "clarify the relevance of his line of questioning." He proffered on appeal that, contrary to the officer's and Mrs. Reid's denials, the officer had told Mrs. Reid the condition of the currency before she had described it. Counsel's theory, not disclosed to the trial court, was, therefore, that "impeachment of Officer Robert's testimony on this point would necessarily have impaired that of Mrs. Reid." 328 A.2d at 381. Having been provided this *post hoc* clarification, this court found error in the complete curtailment of the examination, reaffirming that "[a]n exhaustive proffer is not normally a strict requirement for initiation of a line of cross-examination." *Id.* at 382.

An unarticulated theory of relevance, whereby one witness' testimony is impeached through

made a proffer inadequate to show relevance.

Since counsel's proposed line of cross-examination was made in good faith and was relevant to show bias, I conclude that the trial court had no discretion to cut it off. A trial court has considerable discretion to limit bias cross-examination into sensitive matters such as a witness' prior bad acts, but that discretion exists only after some cross-examination is allowed. *Tinker v. United States*, 135 U.S.App.D.C. 127–28, 417 F.2d 542, 544–45, *cert. denied*, 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969). *See also Collins v. United States, supra,* 491 A.2d at 487.

The government argues that the error was harmless. Under *Delaware v. Van Arsdall,* —— U.S. ——, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), error in precluding bias cross-examination must be evaluated under the harmless error standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Van Arsdall,* thus, overrules that aspect of *Springer v. United States,* 388 A.2d 846, 856 (D.C.1978), holding that *in limine* curtailment must be evaluated by a *per se* error standard. *See James v. United States,* 514 A.2d 793, 796 (D.C.1986). Under *Van Arsdall,* "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized," this court "might nonetheless say that the error was harmless beyond a reasonable doubt." —— U.S. ——, 106 S.Ct. at 1438, 89 L.Ed.2d 674. This formulation, which assumes that the witness' credibility is undermined, appears to accord with our cases holding that, where the record does not disclose what evidence the cross-examination would have elicited, the government must show beyond a reasonable doubt that the defendant would have been convicted without the witness' testimony. *Tabron v. United States,* 444 A.2d 942, 944 (D.C.1982).

Appellant was alleged to have assisted the gunman, Leonard Briscoe, in robbing Jackson. Briscoe then robbed another victim after his aider and abettor ran away down an alley. An off-duty police officer, surprising Briscoe in the course of the second robbery, shot him as he escaped. Briscoe got into a car at the mouth of an alley. Evidence on both sides agreed that appellant and Briscoe's brother, Maurice, were in the car. They drove Briscoe to a hospital, where he died. The police located the car at the hospital shortly after it arrived and arrested appellant and Maurice Briscoe. A gun was found on the street nearby. Inside the car was a beige jacket which contained several of Forrest Jackson's credit cards. The police also found in the car a blue duffle bag, which contained Jackson's belongings.

The defense put on an implausible, but conceivable, alibi. Several witnesses, including Maurice Briscoe, testified that appellant and he had been at a party before the robbery. According to Briscoe, corroborated by Angela Harris, after the party he and appellant drove Harris to her home in the area of the robbery. They were waiting for her to go to her house and get a telephone number to give to Maurice Briscoe when his brother appeared, injured, and asked to be taken to the hospital.

Several government witnesses identified appellant, but all the identifications except Jackson's were subject to doubt. Three witnesses stated at the show-up only that appellant "looked like," or "looked familiar to" the person with the gunman. Two of these witnesses made no in-court identification; the one who made such an identification testified that at the show-up he did not recognize appellant. Another witness, Price, made a positive in-court identification. He was a friend of Jackson's, however, and was impeached with evidence that he did not tell the police on the scene that he had seen the robbery of Forrest

---

exposure of another's bias, calls for more, not less, explanation to a trial judge than an assertion that a witness is hostile against a party

because dissatisfied with a prior drug (or other) transaction between the two. Yet the result is that in *Best* error is found and here it is not.

Jackson, and that he did not tell the police after the show-up that he recognized any of the suspects. Jackson, therefore, was the only witness who gave both positive show-up and in-court identifications. Moreover, he was the only witness who could describe in detail the robbery itself, and was the only witness who claimed to know appellant.

The government also offered strong circumstantial evidence. Appellant's admitted presence in the car was part of that evidence, but more important were Jackson's credit cards in the beige jacket, which the government argued was appellant's. However, the only descriptive evidence linking the jacket to appellant was testimony by Jackson and his friend, Price. Jackson's testimony cannot be considered in this harmless error analysis and Price's must be discounted because of his relationship to Jackson and his failure to provide an on-the-scene description or identification.

The government reasoned at trial that the beige jacket must have been appellant's because it was found in the front seat, where appellant sat; because Leonard Briscoe, who drove, said the jacket was not his; and because the jacket, with no blood on it, could not have been the wounded gunman's. This evidence, however, was also disputed. A police officer testified that the jacket was found in the back seat. He said there was blood on both it and a blue jacket, found just outside the parked car. Leonard Briscoe testified that appellant was wearing the blue, not the beige jacket.

Viewing all of the evidence summarized in the foregoing paragraphs, and leaving credibility issues to the jury, I cannot say beyond a reasonable doubt that the jury would have convicted appellant without Jackson's testimony. Jackson's testimony was not merely cumulative, and the other evidence, subject to doubt on various *grounds*, was not overwhelming. Accordingly, I must respectfully vote to reverse.